IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SHAWN COSTELLO,                    )
                                   )
     Plaintiff,                    )
                                   )
     v.                            )     1:03CV01050
                                   )
THE UNIVERSITY OF NORTH            )
CAROLINA AT GREENSBORO,            )
                                   )
     Defendant.                    )

MEMORANDUM OPINION

OSTEEN, District Judge

Plaintiff Shawn Costello, a former student and member of the golf team at Defendant The University of North Carolina at Greensboro ("UNCG") filed this disability discrimination action against UNCG; The University of North Carolina; The Board of Governors of the University of North Carolina; and Terrence Stewart, coach of the UNCG golf team, individually. The suit originally alleged claims under the Due Process and Equal Protection Clauses of the United States Constitution; Title III of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12181 et seq.; Section 504 of the Rehabilitation Act of 1973 ("section 504" or the "Rehabilitation Act"), 29 U.S.C. § 794; and Section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983. The court has since dismissed all claims except for the Rehabilitation Act claim against UNCG. This matter is before the court on Defendant's Motion for Summary Judgment on the remaining

claim. For the reasons stated below, the court will grant the motion.

I. **FACTUAL BACKGROUND**

In the light most favorable to Plaintiff,[1] Shawn Costello was a student and member of the men's golf team at UNCG from August 2001 until May 2003. While on the golf team, Plaintiff attended UNCG on a partial athletic scholarship. During Plaintiff's freshman year, his scoring average was fourth out of the eight members of the team. At the end of Plaintiff's freshman year, the coach of the men's golf team, Terrence Stewart ("Coach Stewart"), told Plaintiff and another player that if they worked hard and improved, they would form the core of the team the following year.

In August 2002, at the beginning of Plaintiff's sophomore year, Plaintiff's father, Dick Costello, told Coach Stewart that Plaintiff had been diagnosed with moderate to severe Obsessive-Compulsive Disorder ("OCD"). The symptoms Plaintiff experienced as a result of his OCD mainly related to his wanting things to be done a particular way or "just so," and Plaintiff feared that if he did not complete rituals and tasks perfectly, something bad could happen to him or his family. His symptoms included checking rituals; performing tasks, such as, speaking, swallowing, folding clothes, reading, humming, blinking, sitting,

---

[1] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Randall v. United States, 30 F. 3d 518, 522 (4th Cir. 1994).

and walking until he felt a certain way or the tasks were done perfectly; recurring negative thoughts when trying to focus; inability to directly touch things in public places; washing and cleaning rituals; fear of failure; wanting everything to be in place, in order, and symmetrical; and feeling the need to practice longer than other golfers. Plaintiff also suffered from some symptoms associated with attention deficit hyperactivity disorder, including short attention span, easily becoming distracted, and tuning out during conversations. While Plaintiff could perform all his daily activities and follow rules to a reasonably high standard, it took Plaintiff a considerable amount of extra time, energy, and effort to complete tasks.

When he learned of the diagnosis, Coach Stewart initially asked if he should "red shirt" Plaintiff as if he had a broken ankle. Plaintiff's father persuaded him not to do so because Plaintiff's doctor recommended that he continue to play golf. Plaintiff met with Coach Stewart and informed him that he would be seeking cognitive behavior therapy ("CBT") to treat his OCD, which Coach Stewart reluctantly agreed to allow. Plaintiff then began seeing a psychologist, Dr. Dennis McKnight, who provided Plaintiff with a weekly appointment for CBT on Tuesdays at 4:00 p.m. Plaintiff told Coach Stewart about his standing appointment, and Coach Stewart appeared to accept the appointment schedule and allow Plaintiff to make up missed practices.

Coach Stewart reported Plaintiff's diagnosis to his supervisors in the UNCG Department of Intercollegiate Athletics

3

(the "Department").  The Department conducted a series of internal meetings and sought consultation from Dr. John Edwards, Director of the UNCG Counseling and Testing Center, regarding Plaintiff's OCD.  Dr. Edwards reported that OCD was not a psychotic disorder, that UNCG could not require Plaintiff to receive counseling, and that Coach Stewart should observe Plaintiff and report any ritualistic behavior to the Head Athletic Trainer, James Shipp.

At the beginning of the 2002-03 school year, Coach Stewart provided to each member of the golf team a policy handbook, which he reviewed with them at their first meeting.  The handbook included team rules and expectations, contact numbers, tournament and practice schedules, and procedures for notifying Coach Stewart if a student had to be late to or absent from practice. Coach Stewart expressed to the student-athletes that repeated or very serious rules violations could lead to dismissal from the team.

Plaintiff was chosen to play in the first tournament of the season at which he finished last on the UNCG team.  After the tournament, Plaintiff continued to participate in team practices and tournament qualifying rounds ("qualifiers").  When Plaintiff missed part of a three-day qualifier in October 2002 for an appointment with Dr. McKnight, Coach Stewart did not allow him to make up the missed portion because playing conditions would not have been equal in a makeup session.  However, Coach Stewart did allow Plaintiff to play in the remaining two days of the

4

qualifier and to remain eligible for the coach's pick on the tournament team. Throughout the 2002-03 season, Coach Stewart reported Plaintiff late to or absent from various practices, qualifiers, workouts, and study hall sessions, many of which Plaintiff missed due to doctor's appointments. When Plaintiff did participate in practices and qualifiers throughout the 2002-03 season, Coach Stewart did not choose him to play in any further tournaments. Instead, Coach Stewart began selecting the team from the same general lineup of top players, and Plaintiff was not a part of this group.

During the fall of 2002, Dr. McKnight sent two letters to Coach Stewart requesting accommodations for Plaintiff's OCD, particularly requesting Coach Stewart to excuse Plaintiff's absences for doctor's appointments. The University Counsel's office informed the Department that special arrangements needed to be made only if Plaintiff could not participate due to a physical or mental impairment, not merely because of a scheduling conflict. Furthermore, Plaintiff had not yet registered with the Office of Disability Services ("ODS") to request accommodation for his OCD. Therefore, Coach Stewart continued to note Plaintiff's absences and to require him to make up missed practices. On February 26, 2003, UNCG Athletic Director Nelson Bobb sent Plaintiff a letter informing him that he would have to register with ODS to receive accommodation for his disability. Plaintiff reported to ODS and completed required forms, but he

5

never provided the records from his doctor necessary to complete the registration process.

At the end of the 2002-03 season, Coach Stewart decided to remove Plaintiff from the UNCG golf team, citing team rules violations and misconduct as the basis for his decision. Officials in the Department reviewed Stewart's decision and ultimately agreed with it. On May 9, 2003, Coach Stewart notified Plaintiff that he would be dismissed from the team and that his scholarship would not be renewed. Coach Stewart told Plaintiff that he could appeal both the dismissal and the scholarship denial. Plaintiff appealed only the scholarship non-renewal, but the Financial Aid Committee upheld Coach Stewart's decision. After being dismissed from the UNCG golf team, Plaintiff transferred to Western Carolina University to play on the golf team, but in doing so, Plaintiff lost one year of collegiate eligibility.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552 (1986).

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356 (1986) (citations & footnote omitted) (quoting Fed. R. Civ. P. 56).  The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).  However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine.  Fed. R. Civ. P. 56(c); Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.  A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

**III. ANALYSIS**

To establish a violation of the Rehabilitation Act, Plaintiff is required to prove the following: "(1) that he has a disability; (2) that he is otherwise qualified for the employment or benefit in question; and (3) that he was excluded from the employment or benefit due to discrimination solely on the basis of the disability." Doe v. Univ. of Md. Med. Sys. Corp., 50 F.3d 1261, 1264-65 (4th Cir. 1995) (citation omitted).

An individual is considered disabled under the Rehabilitation Act if he "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities; (ii) has a record of such an impairment; or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B) (2006). With respect to the ADA, the Supreme Court has held that the requirements imposed by the disability definition must "be interpreted strictly to create a demanding standard for qualifying as disabled . . . ." Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197, 122 S. Ct. 681, 691 (2002). Due to similarities in the language of the ADA and the Rehabilitation Act, the two are generally construed to impose the same requirements. Baird v. Rose, 192 F.3d 462, 468 (4th Cir. 1999).

Regulations promulgated under the Rehabilitation Act and the ADA provide further guidance regarding the disability element of a prima facie case of disability discrimination. Pursuant to Rehabilitation Act regulations, a physical or mental impairment

8

may include "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 45 C.F.R. § 84.3(j)(2)(i) (2006). According to the same regulations, major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. § 84.3 (j)(2)(ii). Furthermore, the EEOC defines the term "substantially limits" to mean

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (2006). The EEOC further requires that the following factors be considered in determining whether a person is substantially limited in a major life activity: "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Id. § 1630.2(j)(2). Therefore, to be substantially limited in performing a major life activity, "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." Toyota, 534 U.S. at 198, 122 S. Ct. at 691 (citation omitted).

9

Plaintiff's treating psychiatrist and designated expert, Eric Hollander, M.D., diagnosed Plaintiff with moderate to severe OCD in the summer of 2001.  Both Plaintiff's treating psychologist and designated expert, Dennis McKnight, Ph.D., and Defendant's designated expert, John March, M.D., concur with this diagnosis.  Neither party disputes that OCD may indeed be a mental impairment.  However, a mere medical diagnosis of an impairment is insufficient to prove disability status.  Id. Instead, an individual must show that the extent of the limitation as the individual experiences it is substantial.  Id. at 198, 122 S. Ct. at 691-92 (citation omitted).  Because "disability" is defined with respect to an individual, it is clear that Congress intended the disability determination to be made on a case-by-case basis.  Id. at 198, 122 S. Ct. at 692 (citations omitted).

The parties agree that several of Plaintiff's major life activities were affected by his OCD during the 2002-03 school year.  Defendant's expert testified that "to do those activities of daily living . . . took a considerable amount of extra effort."  (Def's. Mot. Summ. J. Ex. 12 at 3.)  Defendant's expert further noted that activities such as Plaintiff's schoolwork, his golf game, personal relationships, and showering took extra time and effort due to Plaintiff's OCD.  Nevertheless, both parties' experts also agree that despite Plaintiff's OCD, he "could do all the normal things a person does during the day . . . ."  (Id. Ex. 11 at 3.)  Moreover, Dr. McKnight testified that Plaintiff was

10

typically on time for appointments and other obligations, could maintain his course work, and never told Dr. McKnight that he had trouble getting to class or following golf team or school rules. Perhaps most telling is that Plaintiff admitted that he had no trouble abiding by rules or being on time to required events. Therefore, although Plaintiff's daily activities were somewhat affected by his OCD, his impairment did not severely restrict his ability to complete tasks or the time, manner, or duration under which he performed them.

Furthermore, the "substantial impairment" language is properly interpreted to require an individual to be presently substantially limited for the purposes of determining disability status. Sutton v. United Air Lines, 547 U.S. 471, 482, 119 S. Ct. 2139, 2146 (1999). As such, any measures the individual has or is taking to correct or mitigate the impairment must be factored into the determination of whether that person is substantially limited in a major life activity. Id. It is well documented that Plaintiff began regular appointments for CBT with Dr. McKnight in the fall of 2002 and was also placed on medication for his OCD. Dr. McKnight testified that with those treatments, by the spring of 2003, Plaintiff's OCD had improved 80%, and by the time he was terminated from the team later that spring, his symptoms had improved over 90%. Drs. Hollander and March agree that with treatment, Plaintiff's symptoms appeared to have greatly improved. While his symptoms have since relapsed due in part to lack of treatment, at the time of and prior to his

11

termination from the golf team, Plaintiff had experienced substantial improvement.  Neither party disputes that OCD is a long-term impairment to which there is no complete cure.  Nevertheless, as demonstrated by experts for both parties, Plaintiff's OCD was never so severe in nature as to substantially impair any of his major life activities, especially during the times relevant to his golf team termination when he had experienced significant improvement in response to treatment.

In the few cases in which courts have considered OCD to be a disability, the individuals' symptoms were far more extreme than in the instant case.  In <u>Amir v. St. Louis Univ.</u>, the Eighth Circuit held that the plaintiff's severe OCD, which manifested itself in an overwhelming fear that his food and drink were contaminated with poison, causing him to vomit and take laxatives, was a disability because it affected his ability to eat and drink without vomiting and his ability to concentrate and learn.  <u>Amir v. St. Louis Univ.</u>, 184 F.3d 1017, 1023, 1027 (8th Cir. 1999).  In that case, Amir's OCD was more severe than Plaintiff's, as it kept him from eating or drinking without becoming ill.  Although Plaintiff required extra time to accomplish tasks, he could still perform all major life activities with success.  In <u>Humphrey v. Mem'l Hosps. Ass'n</u>, the Ninth Circuit held that the plaintiff's OCD was a disability because it took her inordinately longer than the average person to shower, dress, groom, and cook food often making her significantly late or absent from work.  <u>Humphrey v. Mem'l Hosps.</u>

Ass'n, 239 F.3d 1128, 1134-35 (9th Cir. 2001). Again, while Plaintiff took more time and energy on various tasks, he was still able to perform his daily activities to a reasonably high standard. Plaintiff even admitted that despite the extra time it took to complete tasks, his OCD did not affect his ability to abide by team rules or to be on time to required events. In each of the cited cases, the plaintiffs' OCD severely restricted either their ability to perform major life activities or the time, manner, or duration under which they completed major life activities. While it is clear that Plaintiff's OCD affected many activities in his daily life, Plaintiff has presented no evidence that his OCD was so severe that it substantially limited any major life activity. Therefore, Plaintiff does not have an impairment sufficient to satisfy the disability requirement for a Section 504 claim.

In the alternative, Plaintiff argues that he satisfies the disability requirement because UNCG regarded him as disabled. An individual is regarded as disabled if the defendant either (1) mistakenly believed the individual had an impairment that substantially limited one or more major life activities or (2) mistakenly believed that a non-limiting impairment substantially limited one or more major life activities. Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 703 (4th Cir. 2001) (citation omitted).

UNCG clearly knew that Plaintiff had OCD from the time Plaintiff's father informed Coach Stewart who reported the

13

information to his supervisors in the Department.  However, the fact that UNCG was aware of Plaintiff's impairment, standing alone, is insufficient to show that UNCG regarded Plaintiff as substantially limited in any major life activity.  See id. (citation omitted).  Plaintiff argues that comments made and actions taken by Coach Stewart and other Department officials show that UNCG regarded Plaintiff as disabled.  First, Plaintiff notes that when Coach Stewart initially learned of his OCD, he asked if Plaintiff should be "red-shirted" to treat the condition like a broken ankle.  However, Coach Stewart made this inquiry before he knew anything about the nature of Plaintiff's condition.  Once Plaintiff's father told him more about Plaintiff's OCD, Coach Stewart allowed Plaintiff to continue playing on the team and even selected him to participate in the first tournament of the 2002-03 season, indicating that he did not regard Plaintiff as disabled.  Plaintiff also alleges that immediately after he performed poorly in that tournament, Coach Stewart angrily commented, "I don't give a damn about your OCD." This stray statement is insufficient to show that Coach Stewart regarded Plaintiff as disabled.  If this comment were to support the notion that Coach Stewart viewed any of Plaintiff's life activities as substantially limited, it would have to be Plaintiff's golf game.  However, golfing is not considered a major life activity under the Rehabilitation Act.  See Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 643 (2d Cir. 1998). Even if it were, nothing about this comment suggests that Coach

14

Stewart thought Plaintiff's game was "substantially limited" as the term is strictly interpreted under the Rehabilitation Act. Following this comment, Plaintiff remained on the team and participated in practices and qualifiers for the rest of the season. Therefore, Coach Stewart's mere inquiry about "red-shirting" Plaintiff and one stray comment made in anger after a tournament does not show that UNCG regarded Plaintiff as disabled.

Plaintiff next contends that the Department's actions, once it learned about his OCD, show that UNCG regarded Plaintiff as disabled. In support of this proposition, Plaintiff notes that University officials met multiple times to discuss Plaintiff's disability. Department officials initially met and sought consultation from Dr. John Edwards, the Director of the UNCG Counseling and Testing Center, about Plaintiff's OCD. Once they were informed that the condition was not threatening to Plaintiff or to others, the Department officials resolved the matter by changing nothing other than instructing Coach Stewart to observe Plaintiff for any ritualistic behavior. The Department's subsequent meetings regarding Plaintiff's OCD arose only as a response to receiving correspondence from Plaintiff's psychologist regarding penalizing him for missed practices and to a report of Plaintiff's making potentially suicidal and homicidal threats to Coach Stewart. As a result of these meetings, the Department concluded that Plaintiff was not a threat to himself or anyone else, and there is no evidence that anyone suggested

15

Plaintiff not be allowed to continue playing on the golf team. Moreover, the Department also determined that UNCG did not have to provide accommodations to Plaintiff for missed events due to a mere scheduling conflict.  Rather than support the opposing proposition, the resolution of Department meetings instead tends to show that UNCG did not regard Plaintiff as substantially limited in any major life activity.  It is also clear from case law that mere consultation relating to a plaintiff's condition does not raise a triable issue that the defendant regarded her as disabled.  See Steele v. Thiokol Corp., 241 F.3d 1248, 1256 (10th Cir. 2001) (citation omitted) (holding that plaintiff's supervisor's concern regarding her mood swings and consultation with the company nurse regarding them was insufficient to show that the supervisor regarded plaintiff as disabled).  The only action Department officials took in response to learning of Plaintiff's diagnosis was to conduct meetings to determine the nature of the condition and respond to developments in the situation via consultation with other University officials.  This evidence is insufficient to demonstrate that UNCG regarded Plaintiff as disabled.

**IV.  CONCLUSION**

Because Plaintiff has not shown there is a genuine issue of material fact with respect to Plaintiff having either an impairment that substantially limited one or more major life activities or UNCG regarding Plaintiff as disabled, he has not put forth sufficient evidence on the disability element of his

16

discrimination claim under the Rehabilitation Act.  Plaintiff must set forth a prima facie case for every element of his claim to avoid summary judgment, and he has not met this burden. Therefore, this court will grant Defendant's motion for summary judgment.

An order and judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.

This the 14th day of December 2006.

                                  _____
                                      United States District Judge